Township of Neville, Appellant, *v.* Exxon Corporation and Neville Land Company, Appellees.

Argued March 6, 1974, before President Judge Bow-
man and Judges Crumlish, Jr., Kramer, Wilkinson,
Jr., Mencer, Rogers and Blatt.

*Frederick A. Boehm,* with him *Bresci R. P. Leonard,
Goehring, Rutter & Boehm* and *Robb, Leonard & Edge-
comb,* for appellant.

*Frank J. Gaffney,* with him *John H. Morgan, Ed-
ward G. O'Connor, Thorp, Reed & Armstrong* and *Ec-
kert, Seamans, Cherin & Mellott,* for appellees.

OPINION BY JUDGE CRUMLISH, JR., July 10, 1974:

This appeal is from an order of the Court of Common Pleas of Allegheny County granting Neville Land Company (Neville Land) and its successor in interest, Exxon Corporation (Exxon), a *variance* to construct and operate a petroleum products tank farm on a 51.4 acre tract of land zoned Commercial "C" in the Township of Neville (Township).

In September of 1972, Neville Land and Exxon entered into a land purchase option for the land in question, which Exxon eventually exercised at a purchase price of $960,520.00. The agreement is contingent upon a rezoning of the property to allow a petroleum tank farm use which is specifically prohibited in a "C" Commercial District of the Township by Article III, Section 7(27) and (42) of the applicable zoning ordinance.[1] The 51.4 acre tract is unimproved vacant land situated at the western end of the Township, which is an island of 938 acres surrounded by the Ohio River. The Township is approximately 10 miles from downtown Pittsburgh, with access by way of Route 51, two bridges at the eastern and western ends of the island, and by an interchange of I-79 presently under construction.

The present zoning ordinance was adopted in 1956. It divides the Township into four use districts—Residential "A" (single family dwellings); Residential "B" (multi-family dwellings and other related uses);

---

[1] Section 7. Commercial District "C" provides in pertinent part:

"In this district, the land may be used . . . for any purpose except the following:

Prohibited Uses:

. . . .

27. Gasoline, storage in excess of an amount necessary for use on the premises or in supplying retail trade at service stations.

. . . .

42. Petroleum and petroleum by-products; storage in excess by an amount necessary for use on the premises."

Commercial "C" (permitting all uses except 55 manufacturing uses specifically prohibited), and Industrial District "D" (generally allowing all industrial manufacturing uses including those prohibited by Commercial District "C").[2] The industrial zone covers only 75% of the Township and stretches from the eastern tip of the island two-thirds of its length. The residential zones (comprising approximately 70 acres) are sandwiched between the Industrial District and I-79 to the east and the Commercial District to the West.

Neville Land's property consists of 51.4 of the 70 acres zoned commercial. Of this acreage, Neville Land can presently develop 25.96 acres, as the remainder is in the channel of the Ohio River which overflows the triangular site on two sides. The purchase price agreed upon by Neville Land and Exxon is based upon this usage acreage, with a per acre price of $37,000.00. Exxon's development plan calls for the installation of a total of 11 gasoline and diesel storage tanks in two stages. As planned, the nearest tank would be approximately 750 feet from existing residential properties. The petroleum products are to be brought in by pipeline and distributed by tank truck.

On February 7, 1973, Neville Land submitted a request to the board of commissioners of the Township pursuant to Section 609.1 and 1004(1)(b) of the Pennsylvania Municipalities Planning Code (MPC)[3] that its land be rezoned to Industrial District "D" to permit its development as a tank farm. The commissioners, sitting as a planning committee, conducted a public hearing on the curative amendment in March

[2] Significantly, a petroleum products tank farm is a permitted use in the Industrial District, and Gulf Oil Corporation presently operates a substantial tank farm in the industrial zone toward the eastern end of the island.

[3] Act of July 31, 1968, P. L. 805, as amended by the Act of June 1, 1972, P. L.    , No. 93, 53 P.S. §§10609.1, 11004(1)(b).

1973. On April 12, 1973, the planning committee recommended that the area not be rezoned. A further hearing was held by the commissioners, sitting as a "governing body" as contemplated by Sections 609.1 and 1004 of the MPC, which rejected the curative amendment on June 14, 1973.

Timely appeal of this decision was taken to the court below. Neville Land and Exxon, which was permitted to intervene on appeal having exercised its option on the property, challenged the constitutionality of the commercial zoning as applied to its property as (1) a confiscation of its land without compensation; (2) the product of improper planning by the Township; and (3) "irrational and arbitrary in light of the limited needs for such zoned property in Neville Township." After viewing the property and hearing additional testimony, Judge SILVESTRI of the court below granted a variance and ordered the issuance of building permits for the proposed tank farm. In support thereof the court entered specific findings of fact and the following conclusions of law pertinent to our review:

"2. The size, geography and prior development of the Township of Neville does not lend itself to a well-balanced planning scheme as contemplated by the Act. (MPC)

"3. The Township of Neville and the subject land is unique and peculiar to itself which the present zoning ordinance subjects to an unnecessary hardship.

"4. The present zoning ordinance as applied to the subject property unlawfully prevents the development and use proposed by Neville Land Company.

"5. The proposed use of the subject property is not contrary to nor will it adversely affect the health, safety, morals or welfare of Neville Township.

"6. The appeal of Neville Land Company is sustained and a variance from Ordinance 403, April 13,

1956, as amended, by Ordinance 404, May 11, 1956, is granted upon the terms and conditions set forth in the attached order."

Because the court below considered additional evidence, our review is limited to a determination of whether or not the court committed an error of law or abused its discretion in sustaining the appeal. *Marple Township Appeal,* 440 Pa. 508, 269 A. 2d 699 (1970) ; *Commissioners of Plymouth Township v. Wannop,* 13 Pa. Commonwealth Ct. 237, 320 A. 2d 455 (1974).

Initially we must briefly dispose of Township's contention that the court was without jurisdiction to grant a variance in a curative amendment appeal under Section 1004 of the MPC. If the relief granted by the court could only be characterized as a "variance," we would agree that the court below overstepped its bounds. The variance function delineated in Sections 912 of the MPC is exclusively a function of the zoning hearing board. Section 1006 (1) (d) of the MPC. *See also Eves v. Zoning Board of Adjustment,* 401 Pa. 211, 164 A. 2d 7 (1960). As the appeal here was from a denial of a curative amendment by a "governing body" under Section 1004, the court was without authority to grant a variance. It becomes apparent from a reading of the lower court's opinion, however, that the court decided the appeal on the constitutionality of the ordinance, though it mistakenly labelled the relief granted a "variance," and applied certain standards governing the grant or denial of a variance. What the court granted was a "validity variance" upon a finding that the present zoning deprived Neville Land of any reasonable use of the property. *See Ferry v. Kownacki,* 396 Pa. 283, 152 A. 2d 456 (1959) ; Ryan, *Pennsylvania Zoning,* §§6.1.7, 6.1.8 (1970). As a validity variance is founded upon the same principle as the constitutional attack made by appellees in the court below—the confiscatory effect of the ordinance as applied to Neville

Land's property—we find the court's misnomer of the relief granted to be harmless error.[4]

In reaching the merits of the case, we must conclude that the court below, nevertheless, committed an error of law in *effectively* concluding that the present commercial zoning, as applied to Neville Land, is unconstitutional. We must, of course, begin our inquiry with the well-founded proposition that a strong presumption of constitutionality is attributed to a zoning ordinance, and one challenging the ordinance has a heavy burden of proving that it denies him every reasonable use of his land, *Garbev Zoning Case*, 385 Pa. 328, 122 A. 2d 682 (1956); or that its provisions are otherwise clearly arbitrary and unreasonable, bearing no substantial relationship to the public health, safety and general welfare. *Borough of Malvern v. Agnew*, 11 Pa. Commonwealth Ct. 285, 314 A. 2d 52 (1973); *Clawson v. Harborcreek Zoning Hearing Board*, 9 Pa. Commonwealth Ct. 124, 304 A. 2d 184 (1973). The path which a court must walk when reviewing the planning and land use decisions of local legislative bodies was clearly marked by Justice ROBERTS in *National Land and Investment Company v. Easttown Township Board of Adjustment*, 419 Pa. 504, 215 A. 2d 597 (1965), where he said:

"The days are fast disappearing when the judiciary can look at a zoning ordinance and, with nearly as much confidence as a professional zoning expert, decide upon the merits of a zoning plan and its contribution to the health, safety, morals or general welfare of the community. This Court has become increasingly aware

---

[4] We similarly dispose of Township's argument that the curative amendment procedure followed by appellees under Sections 609.1 and 1004 of the MPC is limited to facial attacks on the constitutionality of a zoning ordinance. *See* Krasnowiecki, *Zoning Litigation and The New Pennsylvania Procedures*, 120 U. Pa. L. Rev. 1029, 1102 (1972).

that it is neither a super board of adjustment nor a planning commission of last resort. . . . Instead, the Court acts as a judicial overseer, drawing the limits beyond which local regulation may not go, but loathing to interfere, within those limits, with the discretion of local governing bodies. . . . The zoning power is one of the tools of government which, in order to be effective, must not be subjected to judicial interference unless clearly necessary. For this reason, a presumption of validity attaches to a zoning ordinance which imposes the burden to prove its invalidity upon the one who challenges it.

. . . .

"While recognizing this presumption, we must also appreciate the fact that zoning involves governmental restrictions upon a landowner's constitutionally guaranteed right to use his property, unfettered, except in very specific instances, by governmental restrictions. The time must never come when, because of frustration with concepts foreign to their legal training, courts abdicate their judicial responsibility to protect the constitutional rights of individual citizens. Thus, the burden of proof imposed upon one who challenges the validity of a zoning regulation must never be made so onerous as to foreclose, for all practical purposes, a landowner's avenue of redress against the infringement of constitutionally protected rights." 419 Pa. at 521, 522, 215 A. 2d at 607 (Citations and footnotes omitted).

Although not mentioned by the lower court or the parties on appeal, our Supreme Court's opinion in *Tidewater Oil Company v. Poore*, 395 Pa. 89, 149 A. 2d 636 (1959) could as well have been written for this appeal. There, an oil company applied for a rezoning of 62 acres of farm land from residential to industrial to enable it to construct a petroleum products tank farm consisting of 9 to 40 tanks. The governing body of Upper Chichester Township denied the request, as

did the zoning hearing board on appeal from a denial of a permit for such use. The court of common pleas reversed the zoning board on appeal finding that the tract was surrounded by industrial uses, including another tank farm, and the municipality had "created an industrial trend in the area which is now too late to stop."

In reversing the court below and sustaining the constitutionality of the ordinance, the late Justice MUSMANNO, in his inimitable style, noted:

"Whether that trend actually exists or not may be disputed, but, in any event, it is for the township to decide whether, if the trend exists, it should be halted. In addition to its large manufacturing areas, Delaware County is blessed with beautiful home and farm land. The local authorities probably reasoned that industry was creeping up too close to this home land, menacing the health and welfare of its people, and threatening it with large ungainly depots and ponderous machinery, crushing out the rural beauty and scenic harmony of their township. They wished to prevent what they foresaw. There is always a point before a threatened collapse materializes, when something may be done to prevent the break. It may well be that if the legendary additional straw had not been loaded on to the camel's back, that proverbial dromedary might have lived out a long life, with vertebrae intact, its hump upright and proud of the part it played in helping to transport the world's burdens.

"But, discussion of an industrial trend, and whether it should be stopped, is more academic than practical because we do not see in the record the engulfing industrialization which appeared to have overawed the court below. However, even if we accept its hypothesis, this does not mean that that creeping glacier of industrialization could not be stopped. To accept the court's reasoning would be to say that no municipality has the

power to limit an encroaching imperilment. It would be to say that land contiguous to an industrial district, though zoned residential, must now also become industrial because of contiguity alone, and that, through a process of chain reaction, all residential land must eventually become industrial land. But neither law nor logic approves of this chameleon process. So long as a property owner is treated in accordance with standards of justice and fairness, he may not complain that a township, concerned about maintaining its predominating rural and residential characteristics, builds dikes to prevent the spread of a flood of steel and iron.

"The township authorities have concluded, upon investigation, factual relevation, and expert testimony, that the building of the Tidewater tanks would harm somebody and, therefore it has the right, if not the duty to take whatever measures the situation demands to prevent the realization of that threatened, foreseeable harm.

. . . .

"The lower court emphasized that the Longbotham Farm was appropriate for use as a tank farm, but an ordinance is not to be declared legally unsustainable merely because it may deprive the owner of the opportunity to devote his land to its most lucrative and profitable use. Swade v. Springfield Township Zoning Board of Adjustment, supra; Pincus v. Power, 376 Pa. 175. So long as the property in question may reasonably be used for purposes required by the zoning ordinance the owner may not legally complain. Garbev Zoning Case [supra]." 395 Pa. at 93, 94, 95, 97, 149 A. 2d at 638, 640.

We do not here suggest that the topography and industrial composition of Neville Island is identical to the community involved in *Tidewater Oil*, or that the state of the art of petroleum storage safety has not advanced in the last fifteen years. In concluding that

the "size, geography and prior development of the Township of Neville does not lend itself to a well-balanced planning scheme as contemplated by the Act" (MPC), however, it is apparent that Judge SILVESTRI unwittingly erred as did the lower court in *Tidewater Oil* by denying the Township its authority to stop the further encroachment of industrial uses upon the bordering residential and commercial zones of the island.

Significantly, the court below did not specifically find that the subject tract cannot be reasonably developed as one of the many commercial uses allowed in the district as presently zoned. The record indicates that two of appellee's witnesses testified that the site would be suitable, if subdivided, for a warehouse or truck terminal.[5] Judge SILVESTRI noted that a truck

---

[5] Wilbert J. McNeil, a real estate broker retained by Neville Land, testified before the Township Commissioners:

"It would make an ideal truck terminal with the proximity of Interstate 79. This is what the truckers are looking for. They are transporting merchandise and with the Interstate being there, it would be a time-saving item to go from a four-lane road to an Interstate highway.

"Q. Would you think the lack of a railroad facility on this property affects its use as a warehouse or truck terminal?

"A. It might make it a little more difficult. Actually the property might have to be divided in order to use it as a warehouse or truck terminal."

James Healy, who was at the time a representative of Neville Land in charge of developing or selling the instant tract, testified in response to a question of whether any trucking companies had inquired about the property:

"We were approached by a trucking company, and I have with me a layout that we made at that time in 1965 from (sic) a possible truck terminal. If anybody would like to see it, there are six parcels for separate truck terminals of about four or five acres each, and they could be put in, and we were approached by the National Trucking Company and I am sure if this property were available it would be developed for truck terminals without any problems.

terminal would not be feasible without a railroad siding nearby. Even were this a sufficient impediment to constitute a confiscation of appellee's property, the record reveals that there presently exists a railroad right-of-way on the site. Given the proximity of I-79, and the commercial development potential spawned by this increased access to the island, we must conclude that Neville Land and Exxon have failed to carry their burden of proving that they cannot reasonably develop their land consistent with the present commercial zoning. As previously indicated, the test in determining the constitutionality of a zoning ordinance is not whether it denies an owner the most economically appropriate use of his property, but rather whether it permits him a reasonable use so as not to be confiscatory. *Tidewater Oil Company v. Poore, supra; Marple Gardens v. Zoning Board of Adjustment,* 8 Pa. Commonwealth Ct. 436, 303 A. 2d 239 (1973).

Reversed.

---

"Q. But you have not had any offers recently?

"A. We have not encouraged any offers. No truck company would offer to buy this property because it would only want to buy a piece of it. None of them would buy 26 acres. You would have to break it into separate pieces."